DREW, J.
| ¶ Glenn Chesney and his wife, Cindy Chesney, along with intervener, Waste Management of Louisiana, L.L.C., appeal a judgment granting an exception of per-emption filed by defendant Copeland Electric Company, L.L.C. and dismissing the Chesney’s action against Copeland. For the following reasons, we affirm in part and reverse in part.
FACTS
Glenn Chesney was employed by Waste Management as the driver of a 10-wheel flatbed truck that carried a removable trash container. Although the trash container is an open metal box, Chesney’s truck was equipped with an automatic tarp system that could cover the container during transport. The tarp system was attached to the truck with movable mechanical arms, and during operation of the system, the arms extended vertically to 17' 9" above the ground.
On August 13, 2010, Chesney drove a loaded trash truck to the Magnolia landfill, a facility in Ouachita Parish owned and operated by Waste Management. When Chesney arrived at the Magnolia facility, the electricity was out.[1] The lack of power meant that the weigh scale at the facility was not working, so the truck drivers had to wait in line for the scale to reopen. The trash trucks lined up on a private road on the Magnolia property to wait. During this time, Chesney decided to untarp his load so he could unload faster when he got to the front of the line. When he activated the mechanical arms to lift the tarp, the arms came into contact with an uninsulated overhead power line. Electricity had been restored to these [ 2lines, and the electricity flowed through the truck, causing Chesney to suffer injury from electric shock.
On August 31, 2011, Chesney and his wife sued Entergy[2] and Copeland Electric *1207 Company (“Copeland”). The Chesneys alleged that:
• Entergy had custody of the power poles and power lines at the entrance and inside the facility and that Copeland installed the power poles and lines.
• Entergy and Copeland were negligent in the installation and maintenance of the overhead power lines, particularly in light of the type of truck traffic present at the Magnolia facility.
• When the overhead lines had originally been installed “at least” 10 years prior to the accident, they were 20 feet above the ground; however, the lines had sagged so that at the time of the accident, the lines were only 13.5 to 15 feet above the ground at their lowest point.
The Chesneys further alleged that the defendants should have known of the hazards posed by the sagging lines. In particular, regarding Copeland, it was alleged that:
• Copeland was an electrical contractor who erected the power poles and power lines located at the main entrance to the landfill.
• Since the date the poles and lines were installed, Copeland has been under contract to inspect and maintain these lines.
• Copeland’s employees visited the landfill occasionally to maintain and inspect the lines as well as to perform other electrical contracting services.
• Copeland’s employees had numerous opportunities during their visits to the premises to observe the condition of the power poles, power lines and entrance road and, also, the opportunity to observe normal landfill activities including the characteristics and uses of trucks and equipment at the landfill.
The Chesneys maintained that Copeland was negligent, inter alia, for:
li* installing and maintaining defectively designed and/or manufactured overhead electrical lines;
• installing and maintaining electrical lines too close to the ground and to traversing traffic, trucks, workers, and equipment;
• failing to raise and/or relocate the electrical lines when they knew or should have known of the characteristics of truck traffic at Waste Management;
• failing to properly inspect the overhead electrical lines;
• failing to adequately warn Waste Management, Entergy, and workers of the dangers associated with the ultra-hazardous overhead electrical lines, either at the time of construction or thereafter;
• failing to warn of the consequences of contact with the high voltage line causing severe or fatal injuries with regard to any operation along the concrete drive in the vicinity of the scales; and
• failing to take reasonable steps to eliminate, minimize, or warn of the danger.
*1208 On September 26, 2011, Waste Management filed an intervention seeking to recover workers’ compensation payments it had made to Chesney. Entergy filed an answer in October 2011 generally denying wrongdoing, and Copeland filed a similar answer in November 2011.
After further discovery, Entergy filed a motion for summary judgment in October 2013. Copeland did not join in this motion. Entergy asserted that Copeland had installed the power poles on Waste Management’s property in 1994, that the poles and electric line were entirely on Waste Management’s property and that Entergy had no electric facilities, poles or lines on that property. Entergy further alleged that Waste Management was responsible for maintenance of its power line, had never authorized Entergy to come onto the property to maintain the line, and would retain a contractor to perform any necessary work or repairs to the line.
| Jnstead óf a motion for summary judgment, Copeland filed an exception of per-emption on October 9, 2013. Copeland contended that Waste Management contracted with Copeland to design and construct the overhead power distribution system at the landfill in the early 1990s, and that Copeland completed the work in 1994. Copeland further alleged that Waste Management never hired Copeland to inspect or maintain any of the power lines or poles after they were designed and constructed. Copeland urged that it performed electrical work at the landfill only when hired by Waste Management to do so and then only on an “as needed” basis, and that Waste Management never hired Copeland to perform any work or services regarding the height of the power line. Copeland cited La. R.S. 9:2772, the provision establishing a 10-year peremptive period for actions related to construction of an improvement to immovable property, and argued that the plaintiffs’ cause of action had been destroyed by peremption.
In support of its exception of peremption, Copeland attached the plaintiffs’ petition, a notice of claim under Copeland’s insurance policy for this incident, Waste Management’s petition for intervention, and the deposition of Mike Copeland, the principal of Copeland Electric.
Waste Management opposed Copeland’s exception of peremption, urging that Copeland had performed work at the landfill several times in 2010 prior to the accident, and that Copeland Electric had a policy and practice, constituting an affirmative duty undertaken by Copeland Electric, to warn its customers of any hazardous condition found at a work site. Waste Management also filed an opposition to Enter-gy’s motion for | ¡¡summary judgment. The Chesneys joined in both of Waste Management’s oppositions.
The Chesneys filed a more detailed opposition to Copeland’s exception of per-emption in May 2014. Noting that the issue of peremption was a separate question from the issue of Copeland’s post-construction negligence, the Chesneys argued that they were complaining of wrongful acts — “post construction negligence”— that were outside the scope of the peremption statute. The Chesneys also argued in the alternative that the electrical wire involved in this incident was not an immovable.
The Chesneys noted in their opposition to the exception that Copeland quoted only the parts of their petition which alleged design and construction defects but omitted the parts alleging post-construction deterioration and failures of inspec *1209 tion. Regarding the issue of post-construction negligence, the Chesneys stated in their opposition:
Since the evidence obtained through discovery indicates that there was no problem with the initial design or construction[3] and, to the contrary, the real problem was post-construction negligence in failing to note and remedy the deteriorated and sagging condition of the electric line, it is important to note that the petition clearly alleges that the line sagged after initial construction, that the post-construction sagging ereat[ed] a hazardous condition due to inadequate clearance, and that all defendants (including Copeland) knew or should have known of this post-construction deterioration but took no step to warn of the condition or remedy it.
Discovery revealed no evidence that Waste Management had ever hired Copeland to perform any electrical work on the power lines themselves after the 1994 installation. The National Electric Code required | fithe line to be installed at least 18' 6" above the road, and the line was at least that high when it was installed. However, during the intervening years, the road was raised by repaving and for various reasons, the lines sagged over time, thus causing the lines to hang closer to the roadway.
The Chesneys further argued in their opposition that “Copeland Electric was regularly involved in maintaining and repairing the Waste Management electrical system [and] Copeland Electric’s employees could see from their own observations that, due to wear and tear over the years, the initially adequate line was deteriorating (sagging) to the point of becoming a hazard, and Copeland Electric employees failed to call this obvious hazard to the attention of its customer.” In support of their argument, the Chesneys submitted Glenn Chesney’s affidavit along with the affidavits of two other Waste Management employees.
The landfill manager, Glenn Duff, stated in his affidavit that he had been employed by Waste Management at the landfill since 2007. He explained that he was familiar with the area where Chesney was injured and had observed the power line on many occasions. Duff said , that the road under the line had been resurfaced, raising it “a couple of inches,” and that the power line had sagged over the years for reasons he did not know. He also said that he did not know that the line was uninsulated and, had he known that, he would have recognized that the saggihg line posed a hazard to the truck traffic. Duff explained that Waste Management relied on outside contractors to perform electrical work and that Copeland Electric had done most of the landfill’s electrical work in recent years. Duff said |7that Copeland employees had made numerous trips to the landfill since Duff had been employed there, although there was no record that Copeland had worked on the power line or poles at the site of Chesney’s accident.
Duff further said that the wire was visible to Copeland employees every time they came into the facility and was visible from most of the locations where they performed work. He stated that Copeland never reported the sagging line to Waste Management, and had they done so, Waste Management would have addressed the dangerous condition. Finally, he said that *1210 Copeland knew that Waste Management had no one on its staff who could do electrical work.
Waste Management route manager Danny Parker testified in his affidavit that the automatic tarp arms on the trash trucks were adjustable. Although they were capable of reaching as high as 19' 2", for the load Chesney was carrying the day of the accident, the arms could be raised 17' 9" above the ground. Photos were taken of the measurement process and attached to his affidavit.
In his affidavit, Chesney explained that on the day of the accident, he was carrying a “low” container or a “short” load which would not have required the tarp mechanism to be fully extended.
The Chesneys also cited the deposition of Michael Copeland, who said that he personally had been to the landfill roughly once a year after 2000 concerning electrical work done by Copeland’s employees. Michael Copeland said that Copeland’s custom and practice was to report any hazardous condition to the owners of a job site, but qualified that by saying, |s“that would be only for something that they were actually working on at the time.” Michael Copeland explained that he had driven under the wire but never noticed it to be hazardous and that he would probably say something to the owner if he felt the line was too low. The Chesneys provided evidence showing that Copeland employees had performed work at the landfill on an average of approximately four visits per year with the most recent visit months before Chesney’s injury.
Concerning the status of the electric wire as an immovable, the Chesneys argued in their opposition:
The portion of the line which went across and above the road is no longer in place, but as far as plaintiffs can determine by observing and photographing other portions of the line which are still visible, the poles which support the electrical lines have guides and the lines run through the guides. The lines are not physically attached to the poles. Enter-gy’s representative describes the lines as “supported on a cross arm.” Plaintiffs infer that the portion of the line which ran overhead above the road was not physically attached to any electrical pole but simply ran through the guides similar to the ones which are present on the remaining electrical poles.
Copeland responded to the opposition by arguing that the power system was an immovable or an improvement to an immovable because it provided and distributed electrical power to and/or across the premises. Copeland noted that the electrical poles were firmly embedded deep into the ground. Further, Copeland argued that the peremption statute extinguished all of the plaintiffs’ claims.
The trial court heard the exception on May 13, 2014, and after hearing some of the parties’ argument, determined that one of the issues to be decided was whether the Chesneys “assert[ed] causes of action outside |9the perimeters of [the peremption] statute.” The court asked for supplemental briefs on that issue and on the immovable issue. The Chesneys filed a supplemental opposition arguing, among other things, that the peremptive statute did not apply to post-construction defects. Copeland filed a reply arguing that the statute extinguished the Chesneys’ cause of action relating to all of Copeland’s conduct.
The matter came back before the trial court on June 16, 2014. The court concluded that the power system at the land *1211 fill was a component part of an improvement to the immovable. The court then discussed the deposition of Mike Copeland and, in light of the applicable jurisprudence, found that Copeland had no duty to Waste Management or its employees except for the limited matters that Copeland had been hired to do over the intervening years. Finding that those matters had nothing to do with the power line that Chesney hit, the court dismissed the Ches-neys’ action against Copeland. On July 21, 2014, the court signed a judgment sustaining Copeland’s exception of peremption and dismissing the Chesneys’ claims against Copeland. The Chesneys and Waste Management appealed.[4]
DISCUSSION
The Chesneys assert five assignments of error urging that the trial court should not have dismissed their case against Copeland on grounds of peremption. These assignments may be divided into two groups: arguments about the applicability of the peremption statute and arguments about the scope of the exception of per-emption.
|10A. Applicability of the Peremption Statute.
Assignment of Error 1. Did the trial court err in granting Copeland’s exception of peremption?
Assignment of Error 2. Did the trial court err in placing the burden of proof on fact issues relating to peremption on the Chesneys?
Assignment of Error 5. Did the trial court commit legal error or manifest error in holding that the overhead high voltage power line involved in Chesney’s injury is an immovable or improvement to an immovable within the meaning of La. R.S. 9:2772?
As noted above, Copeland did not file a motion for summary judgment, but rather an exception of peremption, relying on La. R.S. 9:2772 as a bar to. the Chesneys’ claims against Copeland. When Copeland installed the power system in 1994, the statute provided:
A. No action, whether ex contractu, ex delicto, or otherwise, including, but not limited to, an action for failure to warn, to recover on a contract or to recover damages shall be brought ... against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property ... more than ten years after the date of registry in the mortgage office of acceptance of the work by the owner [or] if no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than ten years after the improvement has been thus occupied by the owner.
The power poles and line had been on Waste Management’s property for approximately 20 years prior to Chesney’s accident.
Regarding the exception of peremption, the supreme court explained in Rando v. Anco Insulations Inc., 2008-1163, pp. 19-20 (La.5/22/09), 16 So.3d 1065, 1082:
Peremption is a period of time fixed by law for the existence of a right. La. Civ.Code art. 3458. The right is extin *1212 guished upon the expiration of the per-emptive period. Id. When the peremp-tive period has run, the cause of action itself is | ^extinguished unless timely exercised. “Peremption may be pleaded or it may be supplied by a court on its own motion at any time prior to final judgment.” La. Civ.Code art. 3460. “Peremption may not be renounced, interrupted, or suspended.” La. Civ.Code art. 3461.
The peremption exception is considered a peremptory exception. La.Code Civ. Proc. art. 927. Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception. Peremption has been likened to prescription; namely, it is prescription that is not subject to interruption or suspension. See also La. Civ.Code art. 3461. As such, the following rules governing the burden of proof as to prescription apply to peremption.
If prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. If evidence is introduced at the hearing on the peremptory exception of prescription, the district court’s findings of fact are reviewed under the manifest error-clearly wrong standard of review. If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Case citations omitted.
Because Copeland built the power system more than 10 years before Chesney’s accident, the Chesneys’ claims about the construction and installation of the power system are perempted on the face of the pleadings. For those issues, the Chesneys had the burden of proving that peremption had not extinguished their action.
The district court correctly concluded that the power line was an “improvement to immovable property”[5] within the ambit of La. R.S. 9:2772.
| ^Tracts of land and their component parts are immovables. La. C.C. art. 462. Component parts of tracts of land are defined in La. C.C. art. 463 as:
Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or un-gathered fruits of trees, are component parts of a tract of land when they belong to the owner of the ground.
La. C.C. art. 465 states that “[tjhings incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts.” Regarding component parts of a building or other construction, La. C.C. art. 466 provides:
Things that are attached to a building and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts. Component parts of this kind may include doors, shutters, gutters, and cabinetry, as well as plumbing, heating, cooling, electrical, and similar systems.
Things that are attached to a construction other than a building and that serve its principal use are its component parts. *1213 Other things are component parts of a building or other construction if they are attached to such a degree that they cannot be removed without substantial damage to themselves or to the building or other construction.
The landfill facility was built upon a tract of land, an immovable under La. C.C. art. 462. The power system, including its component parts such as the power line, is plainly an improvement to this tract of land, making it possible to operate various equipment on the property in furtherance of the landfill’s purpose.
113Although it is unnecessary to determine whether the power cable itself was an immovable,[6] in fact the cable was an immovable. The power system includes 26 power poles which, as Copeland points out, weigh 800 to 900 hundred pounds each and are embedded at least six feet into the ground. Such fixtures are “permanently attached to the ground” within the meaning of La. C.C. art. 468 and “component parts” within the meaning of La. C.C. art. 465. The poles are “construction(s) other than a building.” The power cable was “attached” to the poles where it was suspended by loops on the poles; although the cable could be removed from these suspension points, Copeland points out that the landfill power system incorporated 19,500 feet, or 8.69 miles, of power cable, thus making removal an exceptional undertaking. The power cable carries the electricity to the landfill facility and .thus serves the power poles’ principal use; a purchaser of the landfill facility would expect the power cable to be conveyed with the property along with the rest of the power system. Electrical power transmitted through the cable is essential to the facility’s operation; the power outage at the facility was the reason the truck drivers were parked on the entrance road on the day of Chesney’s accident. Accordingly, the cable is a component part of the power system under La. C.C. art. 466.
Because the power system, including the uninsulated power line that Chesney’s truck contacted, was an improvement to an immovable within the [^meaning of La. R.S. 9:2772, the trial court correctly determined that the plaintiffs’ claims that fall within the scope of this article are per-empted.
B; Scope of the Peremption Statute.
Assignment of Error 3. Did the trial court err in attempting to adjudicate the substantive merits of plaintiffs claims by determining whether Copeland was or was not at fault, when this issue was not presented by Copeland’s exception of peremption?
Assignment of Error 4. Did the trial court commit legal error in failing to recognize that the issue of whether Copeland Electric personnel were at fault is a disputed issue of fact and/or did the trial court commit manifest error in holding that plaintiff had not proved fault on the part of Copeland Electric Personnel?
The Chesneys admit that there was no evidence that Copeland negligently installed the power system in 1994.[7] Indeed, Copeland’s status as the original builder of *1214 the power system is, in this case, irrelevant to the Chesneys’ claims of Copeland’s negligence in their subsequent work. The principal argument on appeal is that the trial court erred by deciding to dismiss the Chesneys’ post-construction negligence claims on an exception of peremption. It is argued both that the procedure employed was improper — Copeland did not file a motion for summary judgment — and that even if the proper procedure had been employed, the disputed questions of fact precldde summary judgment.
We agree that the trial court should not have dismissed the appellants’ claims under the procedural posture of an exception of peremption. The record shows that the parties filed supplemental briefs in response to the | ^court’s concerns that the Chesneys’ claims of post-construction negligence did not fall within the scope of the peremption statute. The parties did so, arguing their positions in light of Bujol v. Entergy Services, Inc., 2003-0492 (La.5/25/04), 922 So.2d 1113; Gardner v. Craft, 47,360 (La.App.2d Cir.9/26/12), 105 So.3d 135, writ denied, 2012-2645 (La.1/25/13), 105 So.3d 723; and Gardner v. Craft, 48,861 (La.App.2d Cir.3/5/14), 137 So.3d 69, writ denied, 2014-0711 (La.5/16/14), 139 So.3d 1029. When the case returned to the trial court for a decision on the exception of peremption, the court analyzed Copeland’s duty in light of the pronouncements in those cases and concluded that the appellants had not shown that Copeland assumed a duty to Waste Management or its employees for workplace safety apart from those matters that Copeland had been hired to address.
Just as a motion for summary judgment is not a substitute for a proper exception, Sonnier v. Conner, 43,811 (La.App.2d Cir.12/3/08), 998 So.2d 344, writ denied, 2009-0309 (La.4/3/09), 6 So.3d 773, likewise an exception is not a substitute for a motion for summary judgment. The legal question of whether a duty is owed may be appropriate for summary judgment, Bufkin v. Felipe’s Louisiana, LLC, 2014-0288 (La.10/15/14), — So.3d —, 2014 WL 5394087, but before that question can be answered, the question must be properly raised and the opponent of summary judgment must be afforded the full opportunity to respond to show that there is a genuine issue for trial. La. C.C.P. art. 967(B). In this case, the Chesneys supplied the trial court with some of the discovery materials they had on the issue of Copeland’s duty, but urge on appeal that their |! (¡response would have been more substantial had they known that the court was going to decide the ultimate question of duty in conjunction with the exception of peremption.[8]
The summary judgment procedure, La. C.C.P. art. 966 et seq., supplies the parties with a framework that protects their rights to be heard on the issues at stake. We appreciate Copeland’s argument that the pleadings had been expanded by the parties’ filings; their supplemental memos addressed whether Copeland had a duty to Waste Management or not. However, the procedure employed in this case did not afford the appellants the more complete opportunity to respond that they would have had if a proper motion for summary judgment been filed and the *1215 usual procedure followed. The appellants should be afforded the full opportunity to present evidence supporting their theory that Copeland owed a duty to Waste Management and its employees to notice and warn the company about the power line; we decline to address that question on appeal in light of our resolution of the procedural issue. Accordingly, insofar as the trial court’s judgment reversed the claims against Copeland for negligence related to post-construction work at the landfill, the judgment is reversed and the case is remanded to the trial court for further proceedings. Costs of this appeal are assessed equally to appellants and to appellees.
DECREE
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. Power to the landfill had been cut after a truck hit a power cable in Monroe.

. Entergy Louisiana, L.L.C.; Entergy Arkansas, Inc.; and Entergy Gulf States, Louisiana, L.L.C.

. In a later argument, the Chesneys asserted that discovery showed that the line "was improperly constructed.”

. The Chesneys consented to the dismissal of their action against Entergy with prejudice.

. The trial court actually stated that the cable was a component part of an improvement to the immovable.

. See Hebert v. Rapides Parish Police Jury, 2002-62 (La.App. 3d Cir.6/5/02), 819 So.2d 470, writ denied, 2002-1809 (La.10/4/02), 826 So.2d 1130, and Wilson v. Bruks-Klockner, 602 F.3d 363 (5th Cir.2010).

. The Chesneys' May 23, 2014, supplemental memorandum says, "Plaintiffs’ position is that, as far as plaintiffs can determine, based on extensive discovery, the original design and construction of the electrical system was *1214 acceptable in all respects. Thus, Plaintiffs are not asserting any claim which is within the scope of LSA-R.S. 9:2772.”

. For example, the exhibits to this record contain the deposition of an Entergy employee discussing some aspects of the duty to report a hazard to a customer and whether a sagging power line was an obvious danger.