STONE, J.
*283 Glenn and Cindy Chesney, along with Waste Management of Louisiana, L.L.C., appeal the trial court's ruling granting summary judgment in favor of Copeland Electric Company, L.L.C., and dismissing the Chesneys' action. For the following reasons, we affirm.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
On August 31, 2010, Glenn Chesney ("Chesney") arrived at the Magnolia Landfill ("the landfill") hauling a removable trash container on a 10-wheel flatbed truck owned by his employer, Waste Management of Louisiana, L.L.C ("Waste Management"). Due to a power outage, the weigh scale at the landfill was not working, and truck drivers had to wait in line for the scale to reopen. While waiting in the line of trucks that had formed along the entrance road on the landfill property, Chesney decided to untarp his load so he could unload faster once he got to the front of the line.
Chesney's truck was equipped with an automatic tarp system that covered his container during transport. The tarp system was attached to the truck with movable mechanical arms. During operation of the system, the arms extended vertically 17 feet 12 inches above the ground. After Chesney activated the mechanical arms to lift the tarp, the arms extended into the air and came into contact with an uninsulated overhead power line. Contemporaneously, electricity was restored to the power lines, and electricity flowed through the truck and electrocuted Chesney. The electrical shock caused Chesney to suffer severe injuries.
On August 31, 2011, Chesney and his wife, Cindy Chesney (collectively referred to as "Plaintiffs"), filed suit against Copeland Electric Company, L.L.C. ("Copeland") and Entergy Electric Company ("Entergy").[1] In their petition, Plaintiffs identified Copeland as the electrical contractor who installed the power lines. According to Plaintiffs, the overhead power lines, designed and installed in 1994, had an initial clearance of 20 feet above the ground. However, due to the passage of time, the power lines began to sag downward and at the time of the accident were only 13.5 to 15 feet above the ground at their lowest point. Plaintiffs claimed Copeland negligently caused Chesney's injuries for the following reasons: 1) Copeland installed and maintained defectively designed and/or manufactured overhead power lines; 2) Copeland installed and maintained power lines too close to the ground and to traversing traffic, trucks, workers, and equipment; 3) Copeland failed to raise and/or relocate the power lines when it knew or should have known *284 of the characteristics of truck traffic at the landfill; 4) Copeland failed to properly inspect the overhead power lines; 5) Copeland failed to adequately warn Waste Management of the dangers associated with the ultrahazardous overhead power lines, either at the time of construction or thereafter; 6) Copeland failed to warn of the consequences of contact with the high voltage line; and 7) Copeland failed to take any reasonable steps to eliminate, minimize, or warn of the danger.
On September 26, 2011, Waste Management intervened in the suit to recover worker's compensation payments it made to Chesney as a result of the accident. Thereafter, Copeland filed an exception of peremption arguing Plaintiffs' claims should be dismissed pursuant to La. R.S. 9:2772 (" Section 9:2772"), which provides a 10-year peremptive period for actions related to construction of an improvement to immovable property. Copeland asserted it was hired by Waste Management to design and construct the overhead electrical lines in the early 1990s. The structure was completed in 1994. Copeland argued that since more than 10 years had elapsed since the system's construction, Plaintiffs' cause of action was barred by peremption. In opposition to Copeland's exception, Plaintiffs argued that some of the wrongful acts they complained of were considered "post-construction negligence" and were outside the scope of the peremption statute.
The trial court agreed with Copeland and found Plaintiffs' construction-related claims were perempted by Section 9:2772. Additionally, as to Plaintiffs' remaining claims for post-construction negligence, the trial court found Plaintiffs failed to establish Copeland owed a duty to Waste Management or its employees, except for limited matters that Copeland was hired to do over the intervening years. The trial court sustained Copeland's exception of peremption and dismissed Plaintiffs' action.
On appeal, this Court affirmed the trial court's finding that Plaintiffs' construction related claims are perempted by Section 9:2772. However, this Court concluded the trial court improperly dismissed Plaintiffs' post-construction negligence claims under the procedural posture of an exception of peremption when summary judgment was the appropriate vehicle to adjudicate those issues. Chesney v. Entergy La., L.L.C. , 49,816 (La. App. 2 Cir. 05/27/15), 166 So.3d 1204. The matter was remanded for further proceedings on the post-construction negligence claims.
Following remand, Copeland moved for summary judgment. Copeland claimed the undisputed facts demonstrated Plaintiffs would not be able to prove Copeland owed them or Waste Management a duty to discover, protect against, or warn of the allegedly hazardous power line. In response, both Plaintiffs and Waste Management argued an electrical professional, like Copeland, has a legal duty to report any electrical hazard that it observes on a customer's premises, even where there is no explicit contract to do so.
After considering the law and evidence, the trial court granted summary judgment, finding Copeland owed no duty to inspect, notify, and/or warn Waste Management of a potentially hazardous condition as it related to the overhead power lines. The trial court dismissed Plaintiffs' and Waste Management's claims and made the following observations in its oral reasons for judgment:
Copeland installed the system back in the early 1990s, designed and installed the system. The system, once it was installed, it was turned over to the ownership of Waste Management. It appears from the facts and the argument *285 that Copeland [sic ] was the [sic ] electrical contractor for Waste Management and, when there were issues related to electrical problems on the premises, Copeland was the company that was called and they came through there on average of roughly four times a year, according to the facts of this case. But there was no special relationship with Waste Management. They were called upon to come out to address electrical issues from time to time but had no special relationship to the extent that they owed a heightened duty to [Waste Management] and persons using the facility there to inspect and warn of a dangerous condition. And given the facts of this case, we're talking only about less than a five percent deviation from the code requirement and the alleged height at the time of the incident; a very small deviation.
The trial court noted that placing a duty on Copeland to inspect and/or notify Waste Management of potential hazardous conditions would be a violation of public policy. Plaintiffs and Waste Management now appeal.
DISCUSSION
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau , 2007-1726 (La. 02/26/08), 977 So.2d 880 ; Driver Pipeline Co., Inc. v. Cadeville Gas Storage, L.L.C. , 49,375 (La. App. 2 Cir. 10/01/14), 150 So.3d 492, writ denied , 2014-2304 (La. 01/23/15), 159 So.3d 1058. On appeal, a trial court's ruling on a motion for summary judgment is reviewed pursuant to the de novo standard of review. Jones v. Estate of Santiago , 03-1424 (La. 04/14/04), 870 So.2d 1002 ; Henderson v. Union Pac. R.R. , 41,596 (La. App. 2 Cir. 11/15/06), 942 So.2d 1259. Appellate courts review summary judgments under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Sup'rs of La. State Univ. , 591 So.2d 342 (La. 1991) ; Lewis v. Coleman , 48,173 (La. App. 2 Cir. 06/26/13), 118 So.3d 492, writ denied , 13-1993 (La. 11/15/13), 125 So.3d 1108 ; Grant v. Sneed , 49,511 (La. App. 2 Cir. 11/19/14), 155 So.3d 61.
A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, admitted for purposes of summary judgment, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. Facts are material if they potentially ensure or preclude recovery, affect a litigant's ultimate success or determine the outcome of the legal dispute. Smith v. Our Lady of the Lake Hosp., Inc. , 93-2512 (La. 07/05/94), 639 So.2d 730 ; Estate of Levitz v. Broadway , 37,246 (La. App. 2 Cir. 05/14/03), 847 So.2d 170. La. C.C.P. art. 966(D)(1) provides the general rule concerning the burden of proof for summary judgment and states in pertinent part as follows:
The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse *286 party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.
When the motion for summary judgment is made and supported as provided in La. C.C.P. art. 966, the adverse party "may not rest on the mere allegations or denials of his pleading," but his response, by affidavits or other proper summary judgment evidence, "must set forth specific facts showing that there is a genuine issue for trial." If he does not so respond, summary judgment, if appropriate, shall be rendered against him. La. C.C.P. art. 967(B).
In conducting our de novo review, we consider all reasonable inferences to be drawn from the record in the light most favorable to the nonmovant. Hines v. Garrett, 04-0806 (La. 06/25/04), 876 So.2d 764.
Liability for negligence is determined by applying the duty/risk analysis. McGuire v. New Orleans City Park Imp. Ass'n, 2002-1401 (La. 01/14/03), 835 So.2d 416. The plaintiff must prove the defendant's conduct was the cause-in-fact of his harm, the defendant owed a duty of care, the defendant breached the duty, and the risk of harm was within the scope of protection afforded by the duty breached. Id. ; Pitre v. Louisiana Tech Univ., 95-1466 (La. 05/10/96), 673 So.2d 585, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996).
Whether a duty exists is a question of law; the inquiry is whether any statutory or judicial law supports the plaintiff's claim that the defendant owed him a duty. Rando v. Anco Insulations, Inc., 2008-1163 (La. 05/22/09), 16 So.3d 1065 ; Lemann v. Essen Lane Daiquiris, Inc., 2005-1095 (La. 03/10/06), 923 So.2d 627.
In Hagood v. Brakefield, 35,570 (La. App. 2 Cir. 01/23/02), 805 So.2d 1230, writ denied , 2002-0557 (La. 04/26/02), 815 So.2d 90, this Court discussed liability for damage caused by defective things. La. C.C. 2317 and 2317.1 state:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
This, however, is to be understood with the following modifications.
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care....
Enacted in 1996, La. C.C. art. 2317.1 effectively negated the concept of "strict liability" for defective things and prescribed a negligence standard based on the owner or custodian's knowledge or constructive knowledge of a defect. However, the article 2317.1 requirement of constructive knowledge imposed a reasonable duty to discover apparent defects in things under the defendant's garde . Hagood, supra. To determine whether a defendant had garde or custody over a thing, a court must consider whether the defendant had the right of direction or control over the thing and what, if any, benefit the defendant derived from the thing. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461 (La. 1991).
Actions under La. C.C. art. 2317.1 require proof that the thing was in the defendant's custody, the thing contained a defect which presented an unreasonable risk of harm to others, this defective condition *287 caused the damage, and the defendant knew or should have known of the defect. Odom v. Siegel, 48,757 (La. App. 2 Cir. 01/15/14), 130 So.3d 1024 ; Johnson v. Super 8 Lodge-Shreveport, 47,081 (La. App. 2 Cir. 04/25/12), 92 So.3d 519.
The sole issue before this Court is whether Copeland owed Waste Management a duty to inspect the electrical power lines or notify Waste Management of any hazardous condition posed by the power lines after their initial installation. In support of their argument that Copeland owed Waste Management a duty to discover and warn of dangers posed by a low hanging power line, Plaintiffs set forth five points.
First, Plaintiffs allege Copeland owed Waste Management a duty because of the special relationship created when Copeland became an approved vendor for Waste Management's electrical services. Plaintiffs insist Copeland had an ongoing relationship with Waste Management and was Waste Management's "go-to" electrical company for several years immediately prior to, and at the time of, Chesney's injury.
Second, Plaintiffs argue Copeland owed a duty because of the frequency with which Copeland provided Waste Management with services. Plaintiffs assert that during the time period leading up to Chesney's injury, Copeland personnel visited the landfill to perform electrical work an average of 4 times per year. Plaintiffs claim that during these periodic visits, Copeland should have noticed the low hanging power line and its potential to injure someone.
Third, Plaintiffs argue Copeland owed a duty because of the seriousness of the hazard. The electrical line involved in Chesney's injury was an uninsulated high voltage line. According to Plaintiffs, all electrical personnel who were deposed acknowledged that, when such a line sags down over a road, it presents a serious hazard to those using the road.
Fourth, Plaintiffs argue Copeland owed a duty because of the predictability of the hazard. Plaintiffs contend that all of the electrical professionals deposed agreed that overhead electrical power lines have a tendency to sag down due to the passage of time. Therefore, Plaintiffs argue that, to an electrical professional, it is predictable and foreseeable that a line that has been in place for many years will gradually sag. Plaintiffs argue Copeland personnel, knowing the age of the line, would know the line was likely to sag, even if they never looked at it.
Fifth, Plaintiffs argue Copeland owed a duty because of the custom and practice of electrical professionals in that industry. According to Plaintiffs, electrical professionals who observe an electrical hazard on a customer's property will typically report the hazard to the customer; this is true even if the hazard is posed by something other than the specific piece of electrical equipment the contractor is hired to work on at the time. Furthermore, Plaintiffs assert since electricians are trained and licensed professionals who possess specialized knowledge and expertise, non-expert customers reasonably rely on them to advise on what they should know about their electrical systems. This includes identification of hazards that are apparent to the electrician because of his specialized knowledge, but may not necessarily be apparent to the customer.
Plaintiffs submitted the partial deposition of a Copeland employee, Kevin Tarver ("Tarver"), who admitted that if he noticed a sagging power line on a customer's premises, he would report it to his supervisor. Plaintiffs also cited a portion of Seth Copeland's ("Seth") deposition. Seth, who is the Safety Director for Copeland, confirmed *288 that Copeland had performed numerous jobs at the landfill for Waste Management.
Moreover, Plaintiffs attached the supplemental affidavit of Brian Duff ("Duff"), Waste Management's manager between 2007 and 2010. In his affidavit, Duff describes how the approved vendor system works and the process by which Copeland Electric became an approved vendor for Waste Management. Duff indicated the relationship between Waste Management and its approved vendors is an ongoing, mutually beneficial relationship, and the vendors understood this. Duff stated Copeland was one of Waste Management's approved vendors and Copeland did almost all of the electrical work at the landfill during the years immediately prior to Chesney's accident.
Conversely, Copeland contends that since the line's completion in 1994, Waste Management has owned and retained exclusive custody and control of the entire overhead power system, including the overhead power line in question. Copeland asserts it has only performed electrical work at the landfill when hired by Waste Management to do so, and then only on an "as needed" basis.
Copeland also argues there is no evidence to support a finding that Copeland and Waste Management shared any "recognized relationship" that would give rise to an affirmative duty to warn of the alleged hazard, or that Copeland ever voluntarily assumed a duty to provide for workplace safety at the landfill. According to Copeland, a vendor and vendee is not akin to the type of fiduciary or confidential relationship that is required to impose an affirmative duty under Louisiana law.
In support of its summary judgment, Copeland submitted the deposition of co-owner Michael Copeland ("Michael"), a licensed electrical contractor. In his deposition, Michael testified that Waste Management contracted with Copeland to install the overhead power line involved in Chesney's accident in the early 1990s. At the time of its completion, the power line complied with industry standards that it be at least 18 feet 6 inches above the ground.[2] Michael stated that at some point around 1998 or 1999, he recalls the road underneath the power line being changed from gravel to concrete which could have contributed to a shorter distance between the line and the road over the years. However, Michael attested that he never noticed a sag over the concrete road that appeared to be hazardous or in noncompliance with the industry standard. Notwithstanding, Michael stated it had never been Copeland's policy, custom, or practice to report hazardous conditions to Waste Management if it became aware of such. According to Michael, Copeland only inspected for and/or reported hazardous conditions to Waste Management when the condition was in connection with a task that Copeland was actually working on at the time.
Michael declared that after Copeland installed the overhead power line, the line became the property and obligation of Waste Management. Michael stated Waste Management never entered into an agreement with Copeland wherein Copeland would periodically come to the landfill to inspect the lines or inform Waste Management of any required maintenance or repairs. Moreover, Michael stated Waste Management had never requested that Copeland perform a safety check of any of Waste Management's power lines. Michael *289 insisted if Waste Management had contracted with Copeland to periodically come to the landfill to inspect the electrical installations, Copeland could have and would have accommodated Waste Management.
A de novo review of the record reveals Copeland did not have a duty to inspect and/or notify Waste Management or Plaintiffs of a potentially hazardous condition as it relates to the overhead power lines. After Copeland installed the power lines, the power lines became the property of Waste Management. At all times prior to Chesney's accident, Waste Management retained custody and control of the power lines. The record does not suggest Waste Management ever contracted with Copeland to periodically inspect or maintain any of the overhead power lines after the lines' initial installation. Likewise, the record is devoid of any evidence indicating Waste Management requested or authorized Copeland to perform any work or services involved in adjusting the height of any of the overhead power lines subsequent to the lines' construction. Louisiana law does not impose upon Copeland a preexisting, affirmative duty to discover and warn of a hazard simply because its employees passed beneath the power line when they entered the landfill to perform entirely unrelated electrical work. Furthermore, there is no evidence that Copeland voluntarily undertook any such duty through a special relationship or otherwise.
Plaintiffs have failed to produce factual support sufficient to establish they will be able to satisfy their evidentiary burden of proof at trial with regard to Copeland's duty to them or Waste Management. Consequently, there is no genuine issue of material fact, and the trial court properly granted summary judgment with regard to the duty issue.
CONCLUSION
For the foregoing reasons, the trial court's judgment granting summary judgment in favor of Copeland is affirmed. Costs of this appeal are assessed to Plaintiffs.
AFFIRMED.

In their original petition, Plaintiffs named Entergy Louisiana, L.L.C.; Entergy Arkansas, Inc.; and Entergy Gulf States, Louisiana, L.L.C. On June 4, 2014, Plaintiffs dismissed their claims against Entergy in a joint motion to dismiss with prejudice.

At the time of Chesney's accident, the National Electric Code ("the NEC") required that the power line have a minimum clearance of 18 feet 6 inches between its lowest point and the road.