|2TERRI F. LOVE, Judge.
This appeal concerns the grant of summary judgment as to some defendants in a wrongful death action following Rufus Butler’s swimming pool drowning in the backyard of a residence owned by Morris Sa-huque, a Florida resident. Sahuque had listed the property for sale “as is” with RE/MAX New Orleans Property (“Re/ Max”). Butler allegedly had been asked to inspect the property to give an estimate for debris and trash removal, and was later found dead at the property. Because we determined that the real estate agent did not have the requisite custody, or garde, of the subject property to find her or the agency strictly liable for Butler’s death, we uphold the district court’s ruling in favor of the defendants.
Plaintiffs-appellants, Lula Mae Butler and her four children (“the Butler family”) appeal the granting of summary judgment in favor of three defendants: RE/MAX; Sandra Pecoraro, the real estate listing agent; and State Farm Insurance Company, the broker’s insurer.[1]
| ?FACTUAL BACKGROUND
On Labor Day, September 4, 1995, Rufus Butler allegedly received a call requesting that he give an estimate to a real estate company for debris and trash hauling from a property that the company had listed for sale. Butler left his home to go inspect the job, but never returned. Two days later, on September 6, 1995, his body was found floating in Sahuque’s pool, which was overgrown with weeds, vegetation and covered with slime. The backyard was infested with snakes and rats.
The property was owned by Sahuque, who had entered into an agreement in December 1994 with RE/MAX and Pecora-ro to sell the property for him. The property was vacant and was to be sold “as is.” With the listing, Sahuque gave Pecoraro a set of keys to the property. She was the only person in the agency who had keys to the property. When Sahuque moved to Florida in January 1995, he padlocked both gates to the backyard and posted warning signs to keep off the property. At the time that Butler’s body was found, however, there were no warning signs or locks on the gates.
The Listing Agreement in effect at the time of Butler’s death was executed on April 24, 1995. On the Property Disclosure Addendum attached to the listing, none of the 19 disclosure questions were answered by the owner, and the comment typed into the comment section at the bottom stated: “Absentee ownership — no statement of condition is being made— property is to be sold in “as is” condition.”
Pecoraro was listed as the “Sales Associate” on the Listing Agreement. She never owned or leased the property, nor did she ever reside at the property. Sahuque nev *45 er authorized her to perform any repairs or maintenance on the property.
RSahuque retained a set of keys to the property and testified that in May 1995, he hired someone to trim weeds, grass and vegetation around the pool, but the pool was not cleaned or chlorinated and had a growth of green algae on the surface.
On September 6, 1995, contractors Royce Jackson and John Johnson went to the property to give an estimate for cleaning and repair costs for a prospective buyer, Beverly Rivers Dancer. Jackson and Johnson met Peeoraro at the property and subsequently found Butler’s body floating in the pool. The coroner’s report indicated that Butler’s body had been in the pool for a couple days.
Peeoraro, Jackson, Johnson, Sahuque, and Dancer had never heard of Butler before his death. Butler ran a trucking and trash-hauling business, and some evidence exists that he went to the subject property to render an estimate for trash hauling.[2] The identity of the person who called Butler to the property is unknown.
Peeoraro is a real estate agent with RE/MAX. She maintains an office in the RE/MAX building and pays a fee to do so. She works on commission with the realty company, which percentage varies.
State Farm provided a policy to RE/ MAX providing coverage for “bodily injury caused by an occurrence which takes place in the coverage territory during the policy period.”

ANALYSIS

Summary judgments are reviewed de novo on appeal by this Court. Smith v. Our Lady of the Lake Hospital, 93-2512 (La.7/5/94), 639 So.2d 730. A summary judgment shall be rendered if the pleadings, discovery, and affidavits, if any, show | ¡¡that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. Louisiana Code of Civil Procedure article 966(B). Summary judgment is designed to secure the just, speedy, and inexpensive determination of every action allowed by law, and is now favored. Id. at 966(A)(2); Dumestre v. Hansell-Petetin, Inc., 96-1778 (La.App. 4 Cir. 1/29/97), 688 So.2d 187.
A fact is material if its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Penalber v. Blount, 550 So.2d 577 (La.1989). Despite the presence of disputed facts, summary judgment will be granted as a matter of law if the contested facts present no legal issues. Rapp v. City of New Orleans, 95-1638 (La.App. 4 Cir. 9/18/96), 681 So.2d 433, 437.
Appellants argue that defendants are liable based on strict liability theory pursuant to Louisiana Civil Code article 2317 that provides:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
Liability should be imposed in this case, assert appellants, based upon custody and not ownership. Custody, or garde, refers to a person’s supervision and control over the thing. Baudoin v. McDermott, Inc., 93-2084 (La.App. 1 Cir. 10/7/94), 644 So.2d 799, 801. Additionally, appellants contend that the determination of garde is a material issue of fact and, therefore, not suitable for summary judgment. Doughty v. *46 Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991).
Under this theory, appellants maintain that Peeoraro and RE/MAX had custody, or garde, of the Belfast property where Butler drowned. Due to the strict liability where custody exists, appellants argue that summary judgment was not an | ^appropriate disposition, but rather they assert that the case should be tried to ascertain the material factual elements. Appellants set forth the factors for determining garde and also assert that, if liability attached to the realty company or agent, the State Farm policy would cover this type of accident.
Conversely, defendants maintain that Peeoraro was merely an agent, not a custodian of the property and, therefore, cannot be held liable for Butler’s death. Under strict liability jurisprudence, defendants argue, in order for a non-owner to be treated as a custodian for purposes of liability, there must be a finding that the owner transferred garde to the non-owner. Loescher v. Parr, 324 So.2d 441, 446 (La.1975); Spott v. Otis Elevator, Co., 601 So.2d 1355, 1363 (La.1992). In this case, defendants argue, no such finding was possible because a real estate agent/broker engaged for purposes of selling a piece of property has never been considered a “custodian” of that property for purposes of strict liability under Article 2317.
Further, under Loescher and Spott, there exists a two-part test to determine whether a defendant has custody to be held strictly liable: (1) the defendant must have the right of direction and control over the thing, and (2) the defendant must derive a benefit from the thing. Defendants assert that Peeoraro did not satisfy the first element because she had no right of direction or control over the property.
Moreover, defendants also contend that even if there was proof that Peeoraro called Butler to the site to give an estimate, which evidence does not exist, she would not be liable for his death because of the “repairman” exception to Article 2317. Where individuals who are hurt in the business of repairing or eliminating the very condition that gave rise to the injury, Louisiana courts have failed to impose liability based on the rationale that the “incentive [to repair a potentially |7dangerous condition] would be destroyed if owners are held strictly liable when repairmen are injured by the very condition they are hired to repair.” Ladue v. Chevron, U.S.A., Inc., 920 F.2d 272, 278 (5th Cir. 1991) (explaining Louisiana law). See also Annis v. Shapiro, 517 So.2d 1237, 1239 (La.App. 4th Cir.1987) (where this Court explained that the swimming pool repairer who was injured was “well aware of the potential danger” and “when a dangerous situation is patently obvious and easily avoidable, it can hardly be considered to present a condition creating an unreasonable risk of harm.”); Shaw v. Fidelity & Cas. Ins. Co., 582 So.2d 919, 922, 923 (La. App. 2d Cir.1991) (where the Court concluded that “all of these factors should have been readily apparent to the decedent, who had years of experience painting houses and using ladders” and “[although a landowner owes a duty to discover unreasonably dangerous conditions on his premises, the landowner is not liable for an injury which results from a condition which should have been observed by the individual in the exercise of reasonable care.... ”).
The Louisiana Supreme Court indeed has established a two-pronged inquiry for determining custody in cases implicating strict liability, as defendants pointed out. The Court explained in Spott, citing Loescher, that “garde” is:
The obligation imposed by law on the proprietor of a thing, or on one who *47 avails himself of it, to prevent it from causing damage to others. The things in one’s care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them.
Spott, 601 So.2d at 1363.
The critical element of the test for purposes of establishing liability in the instant case is whether Pecoraro had the right of direction and control over Sahuque’s property; she obviously stood to derive a benefit from the listing. This Court has previously applied the Loescher-Spott rationale in Akerman v. Dawes, 94 — 0757 (La.App. 4 Cir. 1/19/95), 658 So.2d 1270, where an apartment building manager, who had authority to contract for repairs (unlike Pe-coraro’s lack of authority in the instant case), was found not to have the requisite custody to establish his liability for the injuries of the subtenant when the railing collapsed.
In the instant ease, the real estate agent was simply engaged to sell the absentee owner’s property. The Listing Agreement did not give Pecoraro or RE/MAX the right to make any repairs or provide maintenance to Sahuque’s property. Nothing in the Listing Agreement served to transfer garde to the real estate agent or agency. The mere possession of the keys to the property did not constitute a transfer of custody. Despite the conveyance of keys to Pecoraro, that act in itself simply served to facilitate the desire of the owner for Pecoraro to sell the property.
Moreover, there was no transfer of garde from Sahuque to Pecoraro by the act of the property owner’s agreement to pay Pecoraro a sales commission if she sold the property. That agreement is standard in the real estate industry and cannot reasonably be interpreted as a means of transferring custody of the property to be sold.
The record fails to indicate any evidence whatsoever that could establish the necessary transfer of custody necessary for the agent to have received from the owner the right of direction or control over the property. Therefore, we find that one of the requisite elements of the test to establish a transfer of custody for purposes of imposing Article 2317’s strict liability is absent.
Having determined that the agent did not have garde of the Belfast property where Butler drowned, we need not reach the issue of whether the so-called “repairmen’s exception” to strict liability applies in this case.
| aCONCLUSION
For the reasons discussed above, we hold that the district court properly granted the appellees’ motion for summary judgment. Therefore, we affirm that ruling.
AFFIRMED.
PLOTKIN, J., dissents with reasons.
MURRAY, J., concurs with reasons.

. The Butler family and the owner, Sahuque, entered into a consent judgment against Sa-huque and in favor of the Butlers subsequent to the grant of summary judgment for the other defendants.

. Butler’s notes from the telephone call indicating the address of Sahuque's property were later found by his wife. Also, his employee, Mr. Britton, knew about the prospective job on Belfast Street.