CHUTZ, J.
| gPlamtiffs-appellants, Robert Cheramie and his wife, Emma, appeal the trial court’s grant of summary judgment dismissing their lawsuit against defendants-appellees, Port Fourchon Marina, Inc. (PFM) and Chris Moran Marina, LLC (CMM), based on the conclusion that the premises in which Cheramie sustained personal injuries did not constitute an unreasonable risk of harm for which defendants were liable. We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On February 28, 2012, Cheramie was working as a support supervisor for Team Labor Force, LLC, at marina premises owned by PFM, leased to its sister company, CMM, and sublet to BP Exploration & Production Inc. (BP) in conjunction with BP’s oil spill clean-up operation after the Deepwater Horizon oil rig explosion.[1] As he changed a lightbulb in a boat shed used for storage, which was located on the marina premises, Cheramie fell from an extension ladder he had braced against a rafter in the shed. As a result, Cheramie fell at least 12 feet onto the cement floor and sustained injuries.[2]
Cheramie and his wife subsequently sued PFM and, by amended petition, added CMM as the parties responsible for the premises.[3] The Cheramies contended that because the roof of the boat shed leaked, it caused the wooden | ¡¡rafter that Cheramie had braced the ladder against to become wet. They maintained that as Cheramie reached the top of the ladder, either as a response to the wetness of the wood or due to a slickness created onto the wood because of its wet condition, the rafter shifted or moved, causing the ladder to become unstable.
After discovery, PFM and CMM filed a joint motion for summary judgment averring that the Cheramies failed to establish the premises presented an unreasonable risk of harm so as to constitute a defect for which liability could be imposed. After a hearing, the trial court granted summary judgment on this basis and rendered judgment dismissing the Cheramies’ claims against PFM and CMM. The Cheramies devolutively appealed.
DISCUSSION
A motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and *1215 that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966B(2).[4] In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. Temple v. Morgan, 2015-1159 (La.App. 1st Cir. 6/3/16), 196 So.3d 71, 76, writ denied, 2016-1255 (La. 10/28/16), 208 So.3d 889.
The burden of proof rests with the mover. See La. C.C.P. art. 966C(2). But if the moving party will not bear the burden of proof at trial, the moving party’s burden is satisfied by pointing out an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the adverse party must produce factual support sufficient to establish that they will be bable to satisfy their evidentiary burden of proof at trial. If they fail to do so, there is no genuine issue of material fact. See La. C.C.P. art. 966C(2); Temple, 196 So.3d at 76.
The general rule is that the owner or custodian of property has a duty to keep the property in a reasonably safe condition. The owner or custodian must discover any unreasonably dangerous condition on the premises and either correct the condition or warn potential victims of its existence. Pryor v. Iberia Par. Sch. Bd., 2010-1683 (La. 3/15/11), 60 So.3d 594, 596. This duty is the same whether based on custodial liability under La. C.C. arts. 2317, 2317.1 and 2322,[5] or negligence under La. C.C. art. 2315A.[6] See Jackson v. Brumfield, 2009-2142 (La.App. 1st Cir. 6/11/10), 40 So.3d 1242, 1243.
Under either theory, the plaintiff has the burden of proving that: (1) the property which caused the damage was in the “custody” of the defendant; (2) the property had a condition that created an unreasonable risk of harm to persons on the premises; (3) the unreasonably dangerous condition was a cause in fact of the resulting injury; and (4) the defendant had actual or constructive knowledge of the risk. Graupmann v. Nunamaker Family Ltd. P’ship, 2013-0580 (La.App. 1st Cir. 12/16/13), 136 So.3d 863, 867. Additionally, before custodial liability may be | ¿imposed, our jurisprudence requires that the prop *1216 erty or its defective component part create an unreasonable risk of harm. See Broussard v. State ex rel. Office of State Bldgs., 2012-1238 (La. 4/5/13), 113 So.3d 175, 183.
In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. Reed v. Wal-Mart Stores, Inc., 97-1174 (La. 3/4/98), 708 So.2d 362, 365. To aid the trier-of-fact in making this unscientific determination, the courts have adopted a risk-utility balancing test, which requires consideration of four factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiffs activities in terms of its social utility or whether they are dangerous by nature. Broussard, 113 So.3d at 184.
The question of whether a defect presents an unreasonable risk of harm is “a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts.” Broussard, 113 So.3d at 183 (citing Reed, 708 So.2d at 364). Thus, whether a defect presents an unreasonable risk of harm is “a matter wed to the facts” and must be determined in light of facts and circumstances of each particular case. Broussard, 113 So.3d at 183.
Our jurisprudence does not preclude the granting of a motion for summary judgment in cases where the plaintiffs are unable to produce factual support for their claim that a complained-of condition or thing is unreasonably dangerous. Allen v. Lockwood, 2014-1724 (La. 2/13/15), 156 So.3d 650, 653. Therefore, once the defendants point out a lack- of factual support for an essential element in the plaintiffs’ case, the burden then shifts to the plaintiffs to come forward with evidence to demonstrate that they will be able to meet their burden at trial. Id.
|fiIt is undisputed that PFM and/or CMM had custody of the boat shed located on the marina premises. And at the summary judgment hearing, PFM and CMM conceded that, based on the evidence gathered through discovery, there remained issues of fact. These included: how the accident occurred; how Cheramie had placed the ladder; whether the rafter was wet; and how the rafter responded to the placement of the ladder. But PFM and CMM maintained that none of thesé issues were material so as to preclude summary judgment.
A fact is “material” when its existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of recovery. Facts are material if they, potentially insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of the legal dispute. Simply put, a “material” fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La. 7/5/94), 639 So.2d 730, 751.
Therefore, for purposes of our review of the summary judgment dismissing the Cheramies’ claims against PFM and CMM based on the conclusion there was no unreasonable risk of harm in the premises, we must resolve these factual issues in favor of the Cheramies. Thus, solely for purposes of this review, we presume that the ladder was placed as Cheramie described: in a safe manner. Likewise, we presume the roof leaked, the rafter was wet, and,that it moved or shifted when Cheramie reached the top of the ladder.
*1217 It is undisputed' that PFM and/or CMM bore the responsibility of changing the lightbulbs in the boat shed. At BP’s request, a lighting system was installed into the boat shed. The record fails to establish that PFM was notified that the lightbulb had burned out and needed to be replaced. According to Cheramie’s deposition testimony, he felt that changing the lightbulb was in the scope of his | /‘generalized daily upkeep and maintenance” duties. He believed a DEQ inspection was imminent and since he wanted to pass inspection, he sent his crew to tend to other duties while he changed the lightbulb by himself. Chera-mie conceded, however, that he was unaware of whether a burnt out lightbulb in the boat shed would have resulted in a failed inspection.
Describing in detail his presumably safe placement of the ladder against the wet rafter, Cheramie stated that the ladder was stable as he began his ascent, which was at least 12 feet high. It seemed to him as he climbed to the top “and the weight was put on [the rafter], it seemed that it bowed out.” The ladder became unstable, and he fell off to the right side. Cheramie explained that only the right leg of the ladder continued to make full contact with the rafter; the left leg was “barely on it.” He did not know whether the rafter cracked or broke; was in good condition before he used it; or was regularly wet from the leaks in the roof.[7] According to crew coworker Shain Voisin’s deposition testimony, as he returned to the boat shed, he heard grunting and witnessed Chera-mie holding onto the wooden rafter. Although Voisin could tell the rafter was wet because it had dark spots, he did not know whether the wood was rotten.
■ Turning to the first consideration under the risk-utility balance test, the parties do not dispute the roof has social utility in providing cover for the building, and that the rafter’s utility consists in providing support for the tin roof affixed to it. But the Cheramies point out that because the roof leaked, it was not fully accomplishing its purpose of providing cover for the contents stored in the building or for the effectiveness of the building’s structure which will obviously weaken with an extended exposure to moisture. Voisin testified that the leaky roof interfered with his ability to dó his job because some of the BP storage materials, Rsuch as peat moss, were not supposed to become wet. And in this regard, Cheramie téstified some of the storage material regularly had to be covered to protect it from becoming wet. Although the record established that the roof of the boat shed was repaired at BP’s request in September 2011 after a tropical storm caused the ends to detach, the Cher-amies offered nothing that suggested issues with leaks in the roof created any subsequent problems for BP as it conducted business as the lessee who was utilizing the premises.[8] And the record is devoid of any evidence that the rafter in its condition on the day of the accident did not *1218 provide sufficient support to the tin roof in accordance with the purpose for which it was designed. Thus, even if the roof leaked and the rafters were wet, the record establishes they provided ample utility.
Insofar as the cost of preventing the harm, nothing in the record establishes the amount that replacement of the rafter Cheramie utilized (or all the rafters in the boat shed) and the tin roofing would have cost. Similarly, there is no evidence establishing the cost required for Cheramie to have changed the lightbulb in the boat shed without using the rafter as a brace. Although the record is devoid of any evidence to establish the actual monetary cost of avoiding the harm, Cheramie admitted that nothing prevented him from waiting for another worker to assist him in the lightbulb changing project. Therefore, the record shows that delaying the undertaking would not have cost anything and may have prevented the harm.
Turning to the likelihood and magnitude of harm created by the leaky roof and the wet rafter, PFM and CMM urge they were minimal. They buttress this 13assertion by pointing to a lack of evidence of any complaints by BP. PFM and CMM suggest that when used in the intended manner, neither the roof nor the rafters created an unreasonably dangerous condition. It was when the rafter was used as a brace for an extension ladder that the likelihood of harm increased.
The record’ contains no evidence of any prior accidents in the boat shed and specifically none as a result of the leaky roof or a wet rafter. Only Voisin’s testimony suggested the leaky roof created any sort of problem in that it “interfered” with his job. But there is no evidence that the leaky roof regularly created a dangerous condition to anyone using the boat shed. According to Cheramie, and confirmed by Voisin, the rafters were wet whenever it rained. And Cheramie recalled that it had rained the night before the accident. Looking at photographs taken inside the boat shed shortly after his fall, Cheramie pointed out at least four buckets that he stated were used to collect water when it rained. Therefore, while the Cheramies clearly produced factual support for a finding that the roof leaked, they offered no evidence showing that water puddled or that the leaky roof and wet rafter(s) otherwise caused a hazard to anyone inside or outside of the boat shed. Thus, the record establishes that the likelihood and magnitude of harm from the leaky roof and wet rafter was minimal to visitors regularly using the boat shed.
Lastly, we examine the record insofar as the fourth prong of the risk-utility analysis, i.e., the social utility and extent of dangerousness of Cheramie’s activity of changing a lightbulb by using an extension ladder braced against the wet rafter. The record established that Cheramie violated safety policy when he undertook use of the ladder without another person present. According to Christopher Smith, a worker at the BP oil spill clean-up site who investigated the accident, the presence of a spotter was standard policy for use of any ladder over six feet in height. He also noted that Cheramie had not used the standard job safety analysis before he | )0changed the lightbulb, which would have recounted the proper safety measures for him to follow when using a ladder. Kovas-ka Robinson, another worker at the BP oil spill clean-up job site testified in conformity with Smith, additionally indicating that as part of his training, Cheramie would have received safety awareness advising him how to properly use a ladder. ■
While it is obvious that changing a light-bulb is high in utility, PFM and CMM showed that use of any ladder over six feet in height is inherently dangerous. And the use of an extension ladder braced against a *1219 rafter in order to access a height of at least 12 feet with no one else present to support the ladder is inherently more perilous.
In light of the evidence in this record, we believe that PFM and CMM established the leaky roof and wet rafter were high in utility and that the likelihood and magnitude of harm from the regular ordinary use of them were minimal. Thus, any defect in the leaky roof or wet rafter did not constitute an unreasonable risk of harm to those in and around the boat shed when used in an ordinary, non-dangerous manner.
Based on all of the evidence admitted at the motion for summary judgment hearing, the trial court correctly concluded that PFM and CMM established any defect in the boat shed did not present an unreasonable risk of harm and that the Cheramies failed to counter this showing by producing factual support sufficient to sustain their evidentiary burden of proof at trial. And since neither the leaky roof nor the wet rafter constituted an unreasonable risk of harm, the trial court correctly determined that PFM and CMM did not owe a duty to warn Cheramie of any risk of harm under the facts of this case. Accordingly, the trial court properly dismissed the Cheramies’ claims for damages.
hDECREE
For these reasons, the trial court’s grant of summary judgment and dismissal of the Cheramies’ claims against PFM and CMM is affirmed. Appeal costs are assessed against Robert and Emma Cheramie.
AFFIRMED.
Theriot, J., concur

. PFM entered into an intercompany commercial sublease of the premises with CMM, and CMM subsequently sublet the premises to BP. The marina premises were leased to BP in this manner to facilitate consummation of the lease agreement because CMM was already a BP-approved vendor.

. The exact distance that Cheramie fell and the heights of the roof, rafter, and ladder were not established by the evidence admitted in this summary judgment. Because the petition avers that Cheramie fell between 12 and 15 feet onto a concrete floor and in their appellate brief PFM and CMM allege he fell 16 feet, it is undisputed Cheramie fell at least 12 feet.

.The workers’ compensation insurance company for Team Force Labor, LLC intervened in the litigation seeking to recover payments it had made to Cheramie. PFM filed third party demands against its own liability insurers for errors and omissions in securing coverage; and against CMM for indemnity under the intercompany agreement. Additionally, although the Cheramies named the insurers of PFM and CMM as defendants, the trial court dismissed their claims against CMM’s insurer. A third party demand by PFM against BP for indemnity was also dismissed.

. La. C.C.P. art. 966 was amended and reenacted by Acts 2015, No. 422, § 1, with an effective date of January 1, 2016. The amended version of Article 966 does not apply to any motion for summary judgment pending adjudication or appeal on the effective date of the Act; therefore, we refer to the former version of the article in this case. See Acts 2015, No. 422, §§ 2 and 3.

. La. C.C, art. 2317 provides in part, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.” According to La. C.C. art. 2317.1, "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.” La. C.C. art. 2322 states:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

.See La. C.C. art. 2315A, which states, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”

. Photographs of the boat shed, taken shortly after the accident, do not show any visibly cracked or broken rafters.

. Cheramie maintained that he reported the leaky roof directly to Christopher J. Moran, the president of PFM and a member of CMM, in August 2011 approximately six months before his fall. Moran stated that he subsequently had the roof repaired. While Moran admitted the area above the rafter upon which Cheramie braced the extension ladder was not the site where the roof was repaired, nothing shows that PFM and/or CMM had actual notice that the roof continued to leak after the repair. But the issue of whether PFM and/or CMM had actual or constructive notice of a defect containing an alleged unreasonable risk of harm as a result of the leaky roof was not before the trial court in this motion for summary judgment and, thus, is not before us in this appeal. See La. C.C.P. art. 966F,