**BRITTANY CAVET**           *       **NO. 2020-CA-0454**

**VERSUS**                  *

                            **COURT OF APPEAL**

**ABC INSURANCE COMPANY**   *

**AND MAISON ST. CHARLES,**        **FOURTH CIRCUIT**

**L.L.C.**                    *

                            **STATE OF LOUISIANA**

**\* \* \* \* \* \* \***

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-09372, DIVISION "J"
Honorable D. Nicole Sheppard
\* \* \* \* \* \*
**Judge Paula A. Brown**
\* \* \* \* \* \*

(Court composed of Chief Judge James F. McKay, III, Judge Joy Cossich Lobrano, Judge Paula A. Brown)

David P. Vicknair
Hope E. Hughes
SCOTT VICKNAIR HAIR & CHECKI, LLC
909 Poydras Street, Suite 2025
New Orleans, LA 70112

      COUNSEL FOR PLAINTIFF/APPELLEE

L. David Adams
BRADLEY MURCHIN KELLY & SHEA LLC
1100 Poydras Street Suite 2700
New Orleans, LA 70163

Dennis J. Phayer
BURGLASS & TANKERSLEY, LLC
5213 Airline Drive
Metairie, LA 70001-5602

      COUNSEL FOR DEFENDANT/APPELLANT

                        **REVERSED; REMANDED**
                        **APRIL 21, 2021**

This appeal arises from a confirmation of a default judgment. The district court confirmed the default in favor of Plaintiff/Appellee, Brittany Cavet and against Defendant/Appellant, Maison St. Charles, L.L.C. ("Maison St. Charles"), and awarded Ms. Cavet damages, totaling $1,011,224.98, for personal injuries she allegedly sustained on October 13, 2018. For the reasons discussed below, we reverse the district court's judgment and remand the matter for further proceedings.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 13, 2018, Ms. Cavet suffered injuries when an iron gate (the "gate"), that secured the valet parking lot used by Maison St. Charles, fell on her as she attempted to open the gate. Ms. Cavet filed a petition for damages against Maison St. Charles, on September 26, 2019, alleging she sustained personal injuries as a result of the negligence of Maison St. Charles.[1]

---

[1] The petition alleged, in pertinent part:

> The accident and resulting injuries sustained by Plaintiff CAVET were caused solely by the negligence and fault of the defendant [,] MAISON ST. CHARLES, L.L.C., in the following particulars, among others, which will be shown at the trial in this matter:
>
> a) Failing to provide a safe environment for others;
> b) Failing to warn customers, in particular Plaintiff, of the unsafe condition, despite having actual and constructive notice of the defective gate;

1

On December 17, 2019, after failing to perfect service on Maison St. Charles, Ms. Cavet filed a motion to appoint a special process server, which the district court granted. Counsel for Ms. Cavet filed an affidavit on February 6, 2020, attesting that the citation and petition were served on Maison St. Charles through its registered agent, Delinda Dowden.[2] No answer was filed on behalf of Maison St. Charles. Ms. Cavet filed a motion for a preliminary default, which was granted on February 28, 2020. A hearing to confirm the default judgment was held on March 4, 2020.

At the hearing, Ms. Cavet testified that she was employed by Maison St. Charles, a hotel, as a night auditor for about a year, spanning from 2017 to 2018. She stated that during that time, Maison St. Charles had two valet parking lots (for clarity the lots will be referred to as Lot 1 and Lot 2). Ms. Cavet recalled that Maison St. Charles charged patrons of the hotel "$25.00" to utilize the valet parking lots. Ms. Cavet explained that generally, Maison St. Charles would only utilize Lot 1, because the gate on Lot 2 was broken and remained opened. Ms.

c) Failing to inspect the premises and/or have it properly inspected;
d) Failing to detect and correct the unreasonably dangerous condition;
e) Failing to take all means and precautions necessary to avoid the injury;
f) Failing to reroute guests away from the hazardous condition; and
g) Any and all acts of negligence that shall be proven at the time of trial.

[2] Maison St. Charles disputes service was properly obtained on it through Ms. Dowden, and it filed a separate nullity action which is pending in the district court. *Maison St. Charles v. Cavet*, Civil District Court of Orleans Parish, No. 2020-5436, Division J. La. C.C.P. art. 2005 provides that "[a]n action of nullity does not affect the right to appeal" and that "[a] judgment may be annulled prior to or pending an appeal therefrom, or after the delays for appealing have elapsed." In *Assensoh v. Diamond Nails*, 04-1130, p. 5 (La. App. 4 Cir. 2/16/05), 897 So.2d 806, 810 (quoting 1 Frank L. Maraist and Harry T. Lemmon, *Louisiana Civil Law Treatise: Civil Procedure* § 12.6 (1999)), this Court explained that La. C.C.P. art. 2005 allows that "'the two remedies may be sought simultaneously.'" Thus, the pending nullity action does not impede our review of this matter.

Cavet described the gate in Lot 2 as being a large iron gate which had wheels, and the gate was automated to slide open and shut. However, the automation was not operating, and instead, the gate was opened and shut by hand. Ms. Cavet clarified that the entry into Lot 2 was controlled by the gate, and the entire parking lot was fenced in. Ms. Cavet testified that a week and a half before October 13, 2018, Maison St. Charles lost use of Lot 1, and the only lot in use was Lot 2. Ms. Cavet responded affirmatively when questioned if Lot 2 was controlled and owned by Maison St. Charles.

On October 13, 2018, although Ms. Cavet was not working, she went to Maison St. Charles as a patron between 10:00 p.m. and 11:30 p.m. When she arrived, she saw patrons of Maison St. Charles she knew, standing in Lot 2. She walked over to speak to the patrons and entered Lot 2 through the gate that was opened at that time. Ms. Cavet testified that she visited with the patrons from the hotel for thirty or forty minutes. When she went to leave Lot 2, she discovered that the gate was closed, and she was locked inside the parking lot. The only means of exiting the lot was through the gate. Ms. Cavet testified that she "opened [the gate] by hand" and explained "[i]ts on wheels, so I just pulled it open." When she opened the gate, it fell on her, causing her to fall backwards and hit her head. Ms. Cavet affirmed that, before she opened the gate, she could not ascertain if it was defective, and there was no sign or warning that the gate was defective. She recalled there was a sign on the gate which read "gate stays closed."

Ms. Cavet testified that, when the gate fell on her, she was pinned under it for approximately two minutes before someone came to help her. She stated, as a result of the incident, she sustained a fractured left ankle, a sprained right ankle, a

3

busted lip, a chipped tooth, bruises all over her body, injuries to her head and knee, and a herniated disc in her back.

Ms. Cavet offered the affidavits of Adam Godfrey ("Mr. Godfrey"), Tyler Harvey ("Mr. Harvey") and Lauren Crawford ("Ms. Crawford"), who, respectively, attested regarding the condition of the gate, as follows:

Mr. Godfrey:

2. That he worked at the front desk of the Maison St. Charles hotel from approximately November 2016 to May 2019;
3. That prior to October 2018, he was aware that the gate at the valet lot that caused injury to Plaintiff, Brittany Cavet, was broken;
4. That prior to October 2018, the Maison St. Charles hotel was aware that the gate at the valet lot that caused injury to Plaintiff, Brittany Cavet, was broken;
5. That prior to October 2018, he personally informed the Maison St. Charles hotel's then - Assistant General Management, Vanessa Abney, that the gate that caused injury to Plaintiff, Brittany Cavet, was broken;
6. That prior to October 2018, he personally informed the Maison St. Charles hotel's owner, Amaury Tardieu that the gate . . . was broken; [and]
7. That the fact that the gate was broken was not visually apparent.

Mr. Harvey:

2. That he is employed by Blue Marine Security;
3. That he has been employed by Blue Marine Security since approximately January 2018;
4. That Blue Marine Security provided security guard services to the Maison St. Charles hotel prior to October 13, 2018, on October 13, 2018, and subsequent to October 13, 2018;
5. That as a Blue Marine Security employee, he personally provided security guard services to the Maison St. Charles hotel prior to October 13, 2018 and subsequent to October 13, 2018;
6. That prior to October 2018, he was aware that the gate at the valet lot that caused injury to Plaintiff, Brittany Cavet, was broken;
7. That prior to October 2018, the Maison St. Charles hotel was informed and aware that the gate at the valet lot that caused injury to Plaintiff, Brittany Cavet, was broken;
8. That the fact that the gate was broken was not visually apparent; [and]
9. That the security logs drawn up by Blue Marine Security's guards detail that the gate in question was broken prior to October 13, 2018.

4

Ms. Crawford:

2. That she worked at the front desk of the Maison St. Charles hotel from approximately September 19, 2017 to January 20, 2018;

3. That prior to October 2018, she was aware that the gate at the valet lot that caused injury to Plaintiff, Brittany Cavet, was broken;

4. That prior to October 2018, the Maison St. Charles hotel was aware that the gate at the valet lot that caused injury to Brittany Cavet, was broken;

5. That she has personal knowledge that, prior to December 2017, the Maison St. Charles hotel utilized another parking lot ("the first valet lot") for their valet services because the gate at the valet lot which caused injury to Ms. Cavet was broken and they could not safely secure cars inside;

6. That she has personal knowledge that when the Maison St. Charles hotel lost the right to use the first valet lot, they resorted to using the lot with the gate which caused injury to Ms. Cavet, but never repaired the gate despite using it to secure vehicles in the lot; [and]

7. That the fact that the gate was broken was not visually apparent.

In addition, Ms. Cavet introduced the following evidence into the record: (a) a photograph of the gate that fell on Ms. Cavet, which depicted a long sliding iron gate with wheels that ran on a track, located at the entrance of Lot 2 and the fencing surrounding the lot; (b) photographs depicting Ms. Cavet's injuries; (c) affidavit of Dr. Marco Rodriguez, M.D. ("Dr. Rodriguez"), Ms. Cavet's treating physician; and (d) certified copies of Ms. Cavet's pertinent medical records and bills.

Following the hearing, the district court rendered judgment confirming the default judgment in favor of Ms. Cavet, and against Maison St. Charles. The district court awarded Ms. Cavet damages "in the sum of $15,424.98 representing special damages for past medical expenses, $360,800.00 representing special damages for future medical expenses, and $635,000.00 representing general damages for past, present, and future mental anguish, emotional distress, and pain and suffering . . . ."

This appeal by Maison St. Charles followed.[3]

## DISCUSSION

On appeal, Maison St. Charles asserts the following assigned errors:

1. Ms. Cavet failed to prove at the confirmation hearing a prima facie case that Maison St. Charles was negligent, in that Ms. Cavet failed to prove Maison St. Charles: a. had care, custody and control of the allegedly defective gate that fell on Ms. Cavet; and b. had either actual or constructive knowledge of the existence of an unreasonably dangerous condition existing on its premises;

2. Ms. Cavet failed to prove at the confirmation hearing a prima facie case that she would undergo future medical treatment, rendering her award of future medical expenses excessive;

3. The district court erred in failing to assign comparative fault to Ms. Cavet; and

4. The district court erred in awarding excessive damages.

### DEFAULT JUDGMENT

Louisiana Code of Civil Procedure Article 1702 sets forth the procedure for confirming a default judgment. In order to confirm a default judgment for a delictual obligation, as in the present case, subsection (B)(2) provides:

> When a demand is based upon a delictual obligation, the testimony of the plaintiff with corroborating evidence, which may be by affidavits and exhibits annexed thereto which contain facts sufficient to establish a prima facie case, shall be admissible, self-authenticating, and sufficient proof of such demand. The court may, under the circumstances of the case, require additional evidence in the form of oral testimony before entering a final default judgment.

---

[3] An amicus brief was filed by AXIS Insurance Company ("AXIS"), Maison St. Charles' insurer. The amicus brief raises the same issues as raised by Maison St. Charles. Amicus briefs are limited to argue what the parties raised. *See U. S. Fid. & Guar. Co. v. Victory Land Co.*, 410 So.2d 359, 361 (La. App. 4 Cir. 1982)(citations omitted)("The law is well settled that issues not raised by the litigants cannot be raised by amicus curiae on appeal . . . . [R]elief beyond that which is sought by the parties cannot be requested by amicus curiae.").

6

In addition, "[w]hen the demand is based upon a claim for a personal injury, a sworn narrative report of the treating physician or dentist may be offered in lieu of his testimony." La. C.C.P. art. 1702 (D).

The burden of proof for the party seeking to confirm a default judgment was set forth by the Supreme Court in *Arias v. Stolthaven New Orleans, L.L.C.*, 08-1111, pp. 7-8 (La. 5/5/09), 9 So.3d 815, 820:

> Confirmation of a default judgment is similar to a trial and requires, with admissible evidence, "proof of the demand sufficient to establish a prima facie case." La. C.C.P. art. 1702(A); *Power Marketing Direct* [*v. Foster*], 05-2023 at 10, 938 So.2d [662] at 670 [La. 9/6/06]; [Frank L.] Maraist, [*Louisiana Civil Law Treatise: Civil Procedure* § 12.3, at] 452-453 (2d ed. 2008). The elements of a prima facie case are established with competent evidence, as fully as though each of the allegations in the petition were denied by the defendant. *Sessions & Fishman v. Liquid Air Corp.*, 616 So.2d 1254, 1258 (La. 1993); *Thibodeaux v. Burton,* 538 So.2d 1001, 1004 (La. 1989). In other words, the plaintiff must present competent evidence that convinces the court that it is probable that he would prevail at trial on the merits. *Thibodeaux,* 538 So.2d at 1004. A plaintiff seeking to confirm a default must prove both the existence and the validity of his claim . . . .
>
> At the hearing, the rules of evidence generally apply. La. C.E. art. 1101(A); Maraist, *supra,* at 452-453 . . . . "Because at a default confirmation there is no objecting party, to prevent reversal on appeal, both plaintiff and the trial judge should be vigilant to assure that the judgment rests on admissible evidence" that establishes a prima facie case. George W. Pugh, Robert Force, Gerald A. Rault, Jr., & Kerry Triche, *Handbook on Louisiana Evidence Law* 677 (2007). Thus, inadmissible evidence, except as specifically provided by law, may not support a default judgment even though it was not objected to because the defendant was not present. 19 Frank L. Maraist, *Civil Law Treatise: Evidence and Proof* § 1.1, at 5 (2d ed. 2007).
>
> There is a presumption that a default judgment is supported by sufficient evidence, but this presumption may be rebutted by the record upon which the judgment is rendered. *Ascension Builders, Inc. v. Jumonville,* 262 La. 519, 527, 263 So.2d 875, 878 (1972). Finally, a defendant against whom a default judgment is confirmed may not assert an affirmative defense on appeal. *Galland v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.,* 452 So.2d 397, 398-99 (La. App. 3d Cir. 1984); *Romero v. Sunseri,* 359 So.2d 305, 308 (La. App. 4th Cir. 1978).

The *Arias* court explained that "[i]n reviewing default judgments, the appellate court is restricted to determining the sufficiency of the evidence offered in support of the judgment," and that determination is a factual one "governed by the manifest error standard of review." *Id.,* 08-1111, p. 5, 9 So.3d at 818 (citations omitted).

With these principals in mind, we turn to Maison St. Charles' assigned errors.

### NEGLIGENCE

Maison St. Charles argues that Ms. Cavet failed to prove it was negligent; specifically, it asserts Ms. Cavet failed to prove: (1) it had control or garde of the gate; and (2) it had actual or constructive knowledge of the unreasonably dangerous condition of the gate.

Under the law applicable to Ms. Cavet's claims, there are several possible theories of negligence, if proven, which Maison St. Charles may be found to be liable for the damage caused by the broken gate: (1) if the gate was in Maison St. Charles "custody" at the time of its collapse (La. C.C. art. 2317 and 2317.1)[4]; (2) if the gate is considered a "building," and Maison St. Charles owned it at the time of its collapse (La. C.C. art. 2322), or (3) if the damage caused can be found to have happened because of Maison St. Charles' "fault" (La. C.C. art. 2315). *See Simmons v. Bd. of Comm'rs for Port of New Orleans*, 442 So.2d 836, 838 (La. App. 4th Cir. 1983)(wherein a gate fell on plaintiff resulting in injury, and this Court applied these negligence theories of recovery). To be successful at trial, Ms. Cavet would have to prove only one of the theories of recovery.

---

[4] *See Fontanille v. Levy*, 11-0882, 2012 WL 4754154, *3 (La. App. 4 Cir. 1/25/12), wherein this Court explained that "Article 2317.1 qualifies the responsibility imposed by Article 2317 for an owner of a thing that causes damage to others . . . ."

8

In *Fisher v. Villere*, 20-0242, 2021 WL 717981, *1,*4 (La. App. 4 Cir. 2/24/21), this Court explained, in pertinent part:

"The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law." *Bufkin v. Felipe's Louisiana, LLC*, 14-0288, p. 5 (La. 10/15/14), 171 So.3d 851, 855 (citation omitted). Louisiana Civil Code Article 2315 provides, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody . . . ." La. C.C. art. 2317. Where damages are claimed as a result of vices or defects in the thing within one's custody, La C.C. art. 2317.1 provides:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. . . .

To successfully prove liability pursuant to La. C.C. arts. 2317 and 2317.1, the plaintiff must prove each of the following elements:

> (1) the thing was in the [owner or] custodian's custody or control; (2) it had a vice or defect that presented an unreasonable risk of harm; (3) the defendant knew or should have known of the unreasonable risk of harm; and (4) the damage was caused by the defect.

*Szewczyk v. Party Planners W., Inc.*, 18-0898, p. 7 (La. App. 4 Cir. 5/29/19), 274 So.3d 57, 62. Once these elements are proven, the plaintiff's burden requires proof that the owner knew or should have known of the ruin, vice, or defect which caused the damage; that the owner could have prevented the damage by the exercise of reasonable care; and that the owner failed to exercise such reasonable care. *Id.,* 18-0898, pp. 7-8, 274 So.3d at 62 (citations omitted). Failure of the plaintiff to prove any one of the above factors is fatal to the case. *Id.*, 18-0898, p. 8, 274 So.3d at 62.

Similarly, under La. C.C. art. 2322, a plaintiff must prove the following elements to hold the owner of the building liable for injuries caused by the building's vice, ruin or defect: "(1) ownership of the building; (2) the owner knew

9

or, in the exercise of reasonable care, should have known of the ruin or defect; (3) the damage could have been prevented by the exercise of reasonable care; (4) the defendant failed to exercise such reasonable care; and (5) causation." *Broussard v. State, through Office of State Bldgs., Div. of Admin.*, 12-1238, p. 8 (La. 4/5/13), 113 So.3d 175, 182-83. "[O]ur jurisprudence requires that the ruinous building or its defective component part create an unreasonable risk of harm." *Id*. at 183 (citing *Entrevia v. Hood*, 427 So.2d 1146, 1148-49 (La.1983)).

The duty of an owner or custodian of property to keep his property in a reasonably safe condition is the same whether based on custodial liability under La. C.C. arts. 2317, 2317.1 and 2322, or negligence under La. C.C. art. 2315(A), and the deficiency of a plaintiff to show that the property had a condition that created an unreasonable risk of harm to persons on the premises results in the defendant owing no duty to the plaintiff under any of the theories of recovery. *Cheramie v. Port Fourchon Marina, Inc*, 16-0895, p. 4 (La. App. 1 Cir. 2/17/17), 211 So.3d 1212, 1215 (citation omitted)(footnote omitted). Consequently, under any of the theories of recovery, Ms. Cavet had to prove by the preponderance of the evidence that: (1) Maison St. Charles had ownership or garde/custody of the gate, (2) the gate had a vice or defect that was in an unreasonably dangerous condition or created an unreasonable risk of harm; (3) Maison St. Charles knew or should have known it was in an unreasonably dangerous condition or created an unreasonable risk of harm; and (4) the damage was caused by the defect. Failure to prove one of these factors defeats Ms. Cavet's negligence claim.

**Whether Ms. Cavet proved ownership or garde/custody of the gate**

Maison St. Charles argues Ms. Cavet failed to prove it was the owner or it had garde or custody over the gate in Lot 2; thus, she failed to prove Maison St. Charles owed her a duty.

*Ownership*

In *Cunningham v. M & S Marine, Inc.,* 05-0805 (La. App. 4 Cir. 1/11/06), 923 So.2d 770, this Court reviewed a default judgment in a personal injury case of a seaman against a vessel on which he was working when he was injured. Similar to the present case, the plaintiff had to prove ownership of the vessel. To support this element, the plaintiff introduced his affidavit at the confirmation of default hearing that stated, in part: "On March 18, 2003, I was employed as a seaman aboard the M/V BIG EASY, a vessel owned and/or operated by the defendants [M&S Marine and M&S Towing], which vessel was in the navigable water of the United States in Plaquemines Parish, Louisiana." *Id.*, 05-0805, p. 2, 923 So.2d at 772. On appeal, M & S Towing argued the plaintiff incorrectly alleged that M & S Towing was the owner and/or operator of the vessel. M & S Towing argued that it had absolutely no involvement with the M/V BIG EASY and/or the plaintiff's employment. This Court, in reversing the trial court, held in pertinent part:

> The record reflects that the only evidence presented that M & S Towing was the owner of the vessel was the plaintiff's attestation in his affidavit that M & S Towing was, in fact, the owner. Because there is no exhibit attached to the plaintiff's affidavit that corroborates his statement that M & S Towing was the owner of the vessel and because there was no other basis from which one can conclude that M & S Towing owned the vessel, the plaintiff's statement is inadmissible hearsay. Absent any other evidence of ownership, we find that the plaintiff failed to present sufficient evidence to establish a prima facie case against M & S Towing.

*Id.*, 05-0805, p. 5, 923 So.2d at 774.

In the present case, at the hearing on the motion to confirm the default judgment, Ms. Cavet responded, "Yes," when asked if Lot 2 was "controlled and owned by Maison St. Charles." However, Ms. Cavet did not introduce into evidence any document corroborating her statement that Maison St. Charles owned Lot 2. Moreover, the affidavits submitted at the hearing do not establish or corroborate that Maison St. Charles owned Lot 2. As in *Cummingham*, we conclude that Ms. Cavet failed to establish a prima facie case that Maison St. Charles was the owner of Lot 2; thus, recovery under La. C.C. art. 2322 falls.

*Garde/Custody*

"To determine whether a defendant had *garde* or custody over a thing, a court must consider whether the defendant had the right of direction or control over the thing and what, if any, benefit the defendant derived from the thing." *Chesney v. Entergy Louisiana, L.L.C.*, 51,718, pp. 7-8 (La. App. 2 Cir. 11/15/17), 245 So.3d 281, 286 (citing *Doughty v. Insured Lloyds Ins. Co.,* 576 So.2d 461 (La. 1991)); *See also*, *Thumfart v. Lombard*, 613 So.2d 286, 290 (La. App. 4th Cir. 1993). In *Carroll v. Am. Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767, 774 (E.D. La. 2017)(quoting *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.,* 838 F. Supp. 2d 497, 506, 512 (E.D. La. 2012)), the federal district court explained, in pertinent part:

> In determining whether a party has a legal relationship with a thing so as to have the right of direction and control over it, courts have looked to a variety of factors, including whether the party has the right to use, alienate, encumber, or lease the thing, or otherwise grant a right of use to others [*see Doughty* [*v. Insured Lloyds Ins. Co.*], 576 So.2d 461, 464-65 [(La. 1991)]; *Smith v. State of Louisiana*, 620 So.2d 1172, 1183-84 (La. Ct. App. 1st Cir. 1992)]; whether the party has the right to authorize alterations or repairs to the thing [, *Butler v. Re/Max New Orleans Props., Inc.,* 828 So.2d 43 (La. Ct. App. 4th Cir.

> 2002)], and whether the party has an unfettered right to access the thing at will, versus only a limited access to enter [, *see Bethea v. Great Atlantic & Pacific Tea Co.,* 22 So.3d 1114, 1116 (La. Ct. App. 4th Cir. 2009)].

In the case *sub judice*, the record supports the district court's finding that Ms. Cavet presented sufficient evidence to support that it was more probable than not that Maison St. Charles had the right to unfettered access to Lot 2, it benefitted from using Lot 2, and it had the right to authorize repairs to the gate in Lot 2. Ms. Cavet testified that Lot 2 was regularly used by Maison St Charles for about week and a half before her incident, and Ms. Crawford attested that, when Maison St. Charles lost use of Lot 1, it resorted to using Lot 2.[5] Ms. Cavet testified that Maison St. Charles charged patrons $25.00 per night to park in the parking lot. Mr. Godfrey, Mr. Harvey, and Ms. Crawford, employees or contract employees of Maison St. Charles, attested they informed Maison St. Charles that the gate was broken. Mr. Godfrey stated that he personally informed Maison St. Charles hotel's Assistant General Management, Vanessa Abney, and owner, Amaury Tardieu, that the gate was broken. Mr. Harvey, employed by Blue Marine Security, attested that he told Maison St. Charles that the gate was broken, and the security logs prepared by Blue Marine Security's guards detailed that the gate in question was broken prior to October 13, 2018. Resultantly, we conclude that Ms. Cavet established a prima facie case to prove that Maison St. Charles had *garde* or custody over the gate in valet parking lot. No. 2.

---

[5] Ms. Cavet asserts that the photograph of Lot 2 depicting the gate, which was introduced into evidence, reflects a sign on the gate that stated "Maison St. Charles VALET PARKING ONLY." However, we note the sign, if any on the gate, cannot be seen in the photograph contained in the appellate record.

**Whether Ms. Cavet proved that the gate had a vice or defect that presented an unreasonable risk of harm, and Maison St. Charles knew or should have known of the unreasonable risk of harm**

Maison St. Charles combines these two factors. Maison St. Charles argues that Ms. Cavet failed to prove it had actual or constructive knowledge that the gate was unreasonably dangerous or presented an unreasonable risk of harm. As discussed *supra*, Mr. Godfrey, Mr. Harvey and Ms. Crawford attested they informed Maison St. Charles that the gate was "broken." Maison St. Charles asserts that, although the evidence suggests Maison St. Charles employees may have known the gate was broken, the evidence was insufficient to show it knew that the gate was "so significantly defective" that it was unreasonably dangerous or created an unreasonable risk of harm.

"The mere presence of a defect does not alone elevate that defect to the level of an unreasonably dangerous condition." *Primrose v. Wal-Mart Stores, Inc.*, 48,370, p. 5 (La. App. 2 Cir. 10/2/13), 127 So.3d 13, 17 (citation omitted). In *Todd v. Angel*, 48,687, p. 9 (La. App. 2 Cir. 1/15/14), 132 So.3d 453, 458, the appellate court explained that a "'defect' in a thing, for which one having custody of the thing may be liable for damages caused, is a condition or imperfection that poses an unreasonable risk of injury to persons exercising ordinary care and prudence." "As a mixed question of law and fact, it is the fact-finder's role . . . to determine whether a defect is unreasonably dangerous" and "whether a defect presents an unreasonable risk of harm is 'a matter wed to the facts' and must be determined in light of facts and circumstances of each particular case." *Broussard*, 12-1238, p. 9, 113 So.3d at 183; *see also*, *Hooper v. Brown*, 15-0339, p. 7 (La. App. 4 Cir. 5/22/15), 171 So.3d 995, 1000. In *Broussard*, 12-1238, pp. 9-

14

10, 113 So.3d at 184, the Supreme Court explained the balancing test courts have

adopted to assist the trier of fact in determining if a defect creates an unreasonable

risk of harm:

> To aid the trier-of-fact in making this unscientific, factual determination, this Court has adopted a risk-utility balancing test, wherein the fact-finder must balance the gravity and risk of harm against individual societal rights and obligations, the social utility of the thing, and the cost and feasibility of repair. *See, e.g., Reed* [*v. Walmart*]*,* 97-1174 at p. 5, [(La. 3/4/98)] 708 So.2d [362] at 365; *Boyle v. Board of Sup'rs, Louisiana State Univ.,* 96-1158 (La. 1/14/97), 685 So.2d 1080, 1083; *Entrevia* [*v. Hood*]*,* 427 So.2d [1146] at 1149 [(La. 1983)]. Specifically, we have synthesized this risk-utility balancing test to a consideration of four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature. *E.g., Dauzat v. Curnest Guillot Logging, Inc.,* 08-0528, p. 5 (La. 12/2/08), 995 So.2d 1184, 1186-87 (per curiam); *Hutchinson v. Knights of Columbus, Council No. 5747,* 03-1533, pp. 9-10 (La. 2/20/04), 866 So.2d 228, 235; *Pitre v. Louisiana Tech. Univ.,* 95-1466, pp. 12-16 (La. 5/10/96), 673 So.2d 585, 591-93.

Applying the risk-utility balancing test to the present facts, the utility of the

gate was high; it secured the entry to the parking lot used to park patrons' vehicles.

The gate's utility, however, must be balanced against the likelihood and

magnitude of the harm presented by its defective condition, including whether the

defect was open and obvious. If the gate's condition was open and obvious to all

who encountered it, then the defect may not be unreasonably dangerous. *See*

*Hooper*, 15-0339, p. 9, 171 So.3d at 1001 (citations omitted)("In order for a hazard

to be considered open and obvious, the Supreme Court has consistently stated that

the hazard should be one that is open and obvious to all, *i.e.,* everyone who may

potentially encounter it."). In *Broussard*, the Supreme Court explained that "the

analytic framework for evaluating an unreasonable risk of harm is properly

classified as a determination of whether a defendant breached a duty owed, rather

15

than a determination of whether a duty is owed . . . ." *Id*., 12-1238, pp. 11-12, 113 So.3d at 185. Whether a defendant has breached a duty owed is a question of fact. *Id.*, 12-1238, p. 12, 113 So.3d at 185. Turning to the evidence presented in the case *sub judice*, we conclude that the evidence did not support a finding that the defect was open and obvious. To the contrary, Ms. Cavet testified the defective condition of the gate was not apparent. She stated that the gate was opened when she arrived, and it was closed when she went to leave the parking lot. Likewise, Mr. Godfrey, Mr. Harvey, and Ms. Crawford attested that it was not apparent that the gate was broken.

As to the likelihood and magnitude of harm presented by the broken or malfunctioning large gate, it was high. A broken or malfunction large gate that was on wheels attached to a track which allowed the gate to slide open and shut, while serving as the only entrance and exit to the parking lot, could quickly become a dangerous instrumentality.

Next, the fact-finder must balance the risk of harm against "the cost and feasibility of repair." *Broussard*, 12-1238, p. 23, 113 So.3d at 192 (citation omitted). The *Broussard* court explained that "the cost-benefit analysis employed by the fact-finder in making this determination is more properly associated with the breach, rather than the duty, element of our duty-risk analysis." *Id*., 12-1238, p. 12, 113 So.3d at 185 (citation omitted)(footnote omitted). Ms. Cavet argues that "surely the cost of fixing the security of the [gate] pales in comparison to the risks associated with a large iron gate falling on an employee or hotel guest," and "at minimum, [it had] a duty to warn of the gate's defective condition, which it failed to do." (footnotes omitted.) Ms. Cavet, however, did not offer any evidence at trial to show the cost of repairing or replacing the gate. The Supreme Court, in

16

*Chambers v. Vill. of Moreauville*, 11-898, p. 9 (La. 1/24/12), 85 So.3d 593, 600, held that "cost is a necessary part of the risk-utility balancing test." In *Chambers*, the plaintiff suffered injuries after she tripped and fell due to the deviation in a public sidewalk. The issue before the Supreme Court was whether the deviation created an unreasonable risk of harm. In applying the risk-utility balancing test, the trial court expressly declined to consider the cost factor, although evidence as to this factor was presented at trial. The Supreme Court held that the trial court committed legal error in failing to consider the cost factor, writing:

> [W]e find the trial court applied incorrect principles of law because it failed to consider a necessary component of the risk-utility balancing test in determining whether the instant deviation created an unreasonable risk of harm. Specifically, the trial judge erred when he expressly declined to consider cost, an indispensable component of the risk-utility balancing test. Additionally, we find this error prejudicial because it skewed the trial court's finding of a material issue of fact, that the condition of the sidewalk created an unreasonable risk of harm. Accordingly, this Court will make an independent *de novo* review of the record and address whether the trial court erred in finding the [defect] created an unreasonable risk of harm.

*Id.*, 11-898, pp. 4-5, 85 So.3d at 597. In the case *sub judice*, unlike in *Chambers*, there is no evidence in the record as to the cost to repair or replace the gate, thus, this Court is constrained from conducting a *de novo* review as to this factor. Based on the holding in *Chambers* that "cost is a necessary [and indispensable] part of the risk-utility balancing test," and due to the lack of evidence regarding the cost and feasibility factor of the risk-utility balancing test, we conclude that Ms. Cavet failed to prove that the gate was unreasonably dangerous or created an

unreasonable risk of harm.  Consequently, Ms. Cavet failed to present sufficient evidence to support a finding that Maison St. Charles breached a duty owed to her.[6]

Accordingly, we conclude that Ms. Cavet failed to establish a prima facie case of negligence under La. C.C. arts. 2315, 2317, and/or 2317.1; thus, the district court erred in confirming the default judgment.  The remaining assignment of errors are moot.

## CONCLUSION

Based on the foregoing reasons, the district court's judgment is reversed and the matter remanded to the district court for further proceedings.

**REVERSED; REMANDED**

---

[6] Having found Ms. Cavet failed to prove the gate was unreasonably dangerous or created an unreasonable risk of harm, the remaining factor in the risk-utility balancing test need not be addressed.